The order below is hereby signed.

Signed: February 2 2024

Elizabeth L. Gunn
U.S. Bankruptcy Judge



# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| In re:<br>    Shaw 3rd Holdings, LLC.<br>        Debtor. | Case No. 20-00467-ELG<br><br>Chapter 11 |
| PS Funding, Inc.,<br>        Plaintiff,<br><br>        v.<br><br>Three Sisters Capital Partners, LLC, *et al.*,<br>        Defendants. | Adv. Pro. No. 21-10010-ELG |

## MEMORANDUM OPINION

Plaintiff PS Funding, Inc. ("PS Funding") filed this action seeking a determination as to the priority of two liens on a former asset of the bankruptcy estate of Shaw 3rd Holdings, LLC (the "Debtor"), real property located at 1901 3rd Street, NW, Washington, D.C. 20020 (the "Property"), that was sold pursuant to 11 U.S.C. § 363(f)[1] in the related chapter 11 proceeding. Upon consent of the parties to this case, the liens on the Property as of the date of the sale attached to the proceeds in the same priority as existed immediately prior to closing. Following the sale, the

---

[1] Unless specified otherwise, all chapter, code, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001–9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

1

net proceeds (the "Net Sale Proceeds") from the Property were paid into the Court's registry pending resolution of this adversary proceeding. Main Case, Am. to Corrected Order Approving Debtor in Possession's Mot. to Sell Real Property, ECF No. 82.[2] On July 27, 2023, the Court held a bench trial (the "Trial") in this case and took the matter under advisement. Upon consideration of the pleadings, the evidence, the applicable case law, and the arguments presented at Trial, the Court concludes that PS Funding is entitled equitable subrogation to the liens of JM1 and Tucker Family (as defined herein), and therefore holds a first priority lien on the Net Sale Proceeds in the amount of $1,568,000 plus 8.5 percent interest from February 28, 2019 through May 18, 2022, a second priority lien in the amount of $428,000, both senior to Three Sisters Capital Partners, LLC ("Three Sisters"). The balance of PS Funding's claim holds a fourth priority position. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## I.   Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

## II.   Background

*a.   Liens*

The Debtor was a single purpose entity formed prior to purchasing the Property on or about

---

[2] Citations to the docket for adversary proceeding No. 21-10010-ELG will be referred to as "AP, Document Title, ECF No." Citations to the docket for main case No. 20-00467-ELG will be referred to as "Main Case, Document Title, ECF No."

2

October 1, 2015. The managing members of the Debtor were Napoleon Ibiezugbe and Kevin Falkner. On or about January 16, 2016, the Debtor obtained a refinance mortgage on the Property (the "JM1 Note")[3] from JM1 Investments, LLC ("JM1") in the original principal amount of $1,400,000 secured by a deed of trust recorded on January 22, 2016 (the "JM1 DOT," together with the JM1 Note, the "JM1 Loan"). AP, Ex. 2, ECF No. 73–2. The JM1 Note had a contractual rate of interest of 12 percent, with a default rate of 24 percent.

On May 10, 2016, the Debtor obtained a loan (the "Tucker Note") from Tucker Family, LLC ("Tucker Family") in the amount of $400,000 secured by a deed of trust recorded May 19, 2016 (the "Tucker DOT," together with the Tucker Note, the "Tucker Loan"). AP, Ex 4, ECF No. 73–4. Lawrence Tucker, Esq. ("Mr. Tucker") was the managing member of Tucker Family. Through his firm of Tucker & Associates PLLC, Mr. Tucker prepared the Tucker Note and Tucker DOT, is named as trustee in the Tucker DOT, and served as the closing attorney through Premium Title and Escrow ("Premium Title") for the Tucker Loan. Thus, Mr. Tucker clearly had extensive first-hand knowledge of the Tucker Loan.

On July 23, 2018, the Debtor obtained a loan (the "Three Sisters Note") from Three Sisters in the amount of $300,000 secured by a deed of trust recorded on September 6, 2018 (the "Three Sisters DOT," together with the Three Sisters Note, the "Three Sisters Loan"). AP, Ex. R, ECF No. 71. The Three Sisters Note and Three Sisters DOT were also prepared by Mr. Tucker, who

---

[3] Despite its significance to the issue before the Court, the JM1 Note was not admitted into evidence. In pre-trial motions, Three Sisters (as defined herein) objected to the admission of the document on various grounds, including foundation and authenticity. The Court received testimony from the corporate representative of the closing agent ("Ms. Shannon") as to the terms of the JM1 note based upon her personal knowledge of the JM1 Note, including the interest rates contained therein. Where a witness testifies to their personal knowledge, the best evidence rule does not apply even if a writing contains the same information. *See, e.g.*, *D'Angelo v. United States*, 456 F. Supp. 127, 131 (D. Del. 1978), *aff'd without published opinion*, 605 F.2d 1194 (3d Cir. 1979); *see also Miner v. Sharp Ford-Mercury, Inc. (In re United Tractors, Inc.)*, 13 B.R. 239, 244 n.11 (Bankr. W.D. Mo. 1981) (explaining that Fed. R. Evid. 1002 "is not applicable when a witness testifies from personal knowledge of a matter, even though the same information is contained in a writing"). Therefore, Ms. Shannon's testimony as to the interest rate of the JM1 Note is permissible, and the Court will take her testimony into consideration.

3

served as the closing attorney through Premium Title for the Three Sisters Loan and is named as trustee in the Three Sisters DOT. Despite Mr. Tucker's involvement and direct knowledge of the Tucker Loan, he did not advise Three Sisters of the Tucker Loan, and as a result, Three Sisters believed it would hold a second position on the Property upon the closing of the Three Sisters Loan.

On February 28, 2019, the Debtor obtained replacement financing to satisfy the JM1 Loan and Tucker Loan through a loan (the "BCJCL Note") from BCJCL, LLC ("BCJCL") in the amount of $2,122,500, secured by a deed of trust recorded on March 6, 2019 as instrument number 2019022225 (the "BCJCL DOT," together with the BCJCL Note, the "Replacement Transaction"). AP, Exs. 7, 8, ECF Nos. 73–7, 73–8. The BCJCL Note includes contractual interest at the rate of 8.5 percent, with a default rate of 13.5 percent. AP, Ex. 8, ECF No. 73–8. Immediately after closing on February 28, 2019, the BCJCL Note and BCJCL DOT (the "PS Funding DOT," together with the PS Funding Assignment, the "PS Funding Loan") were assigned (the "PS Funding Assignment") to PS Funding and recorded on March 6, 2019 immediately after the BCJCL DOT as instrument number 2019022226. AP, Ex. 11, ECF No. 73–11. As indicated on the Settlement Statement accompanying the Replacement Transaction, JM1 received $1,568,000 and Tucker & Associates, PLLC[4] received $428,000 at closing from the proceeds of the Replacement Transaction. AP, Ex. 10, ECF No. 73–10. In addition, the Debtor obtained $64,987.18 in cash at closing despite the existence of the Three Sisters Loan. *Id.* At the time of the Replacement Transaction in 2019, Three Sisters was requested to provide a payoff statement, but did not receive any further information about or funds out of the Replacement Transaction.[5]

---

[4] The Court notes that the Tucker DOT was held in the name of Tucker Family, LLC, yet the payment was addressed to Tucker & Associates, PLLC. The Court makes no findings as to this inconsistency. For purposes of this case, the Court shall treat the payment as the payoff of the Tucker DOT.

[5] The issue of whether there is any liability for Tucker & Associates, Lawrence Tucker, Premium Title, or any other

4

Premium Title, as issuing agent for Chicago Title Insurance Company, was engaged as the settlement agent for the Replacement Transaction. As part of the transaction, BCJCL issued a closing instruction letter to Premium Title dated February 28, 2019 (the "Closing Instruction Letter"). Section C of the Closing Instruction Letter set forth the conditions upon which Premium Title was authorized to complete the Replacement Transaction. Section C.4 of the Closing Instruction Letter required Premium Title to confirm "that all liens and encumbrances, including any existing encumbrances, open taxes, open assessments, mortgages and/or deeds of trust recorded against the Property are either cleared prior to closing or will be paid through the closing of escrow." AP, Ex. 9 at 2, ECF No. 73–9. Additionally, section C.5 specifically stated that after completion of the Replacement Transaction, BCJCL shall have a first priority position on the Property. *Id.* The Closing Instruction Letter clearly stated that if Premium Title was "unable to comply with [the] instructions," then it was "not to proceed [to closing] without further authorization." *Id.* at 4. Through Ms. Shannon, a Title and Escrow Officer, Premium Title acknowledged the receipt of the Closing Instruction Letter and the requirement for strict compliance with the terms thereof. *Id.* at 5. Despite the requirement for the Replacement Transaction to result in a first priority lien position, Three Sisters never agreed or otherwise subordinated its lien to either the BCJCL DOT or PS Funding DOT.

On March 12, 2019, shortly after the closing of the Replacement Transaction, a certificate of satisfaction of the Tucker DOT was recorded (the "Tucker COS"). The Tucker COS was prepared and signed by Lawrence Tucker as Managing Member. AP, Ex. I, ECF No. 71. However, it took more than six months for a certificate of satisfaction of the JM1 DOT to be recorded. Nevertheless, a certificate of satisfaction of the JM1 DOT dated August 19, 2019 was recorded on

---

party involved with the Replacement Transaction for their role in the Replacement Transaction without paying or otherwise obtaining a release of the Three Sisters Loan is not before the Court.

5

October 29, 2019. AP, Ex. J, ECF No. 71. Therefore, at all relevant times up through the sale of the Property, the land records of the District of Columbia reflected two deeds of trust of record: (i) the September 18, 2018 Three Sisters DOT in first record position; and (ii) the March 6, 2019 PS Funding DOT in second record position.

> *b.    The Underlying Bankruptcy Case*

In default on its obligations to Three Sisters and PS Funding and facing an imminent foreclosure sale, the Debtor filed a voluntary chapter 7 petition on December 2, 2020. Main Case, Chapter 7 Vol. Pet., ECF No. 1. Less than one month later the Debtor filed a motion to convert its case to one under chapter 11, which the Court granted on February 24, 2021. Main Case, Mot. to Convert Case from Ch. 7 to 11, ECF No. 7; Main Case, Order Granting Mot. to Convert, ECF No. 10. PS Funding filed a claim in the Debtor's case asserting a prepetition balance due of $2,538,226.83. Main Case, Proof of Claim 1 (Claim of PS Funding). Three Sisters did not file a proof of claim but was scheduled by the Debtor with a claim of $200,000. Main Case, Sched. D at 11, ECF No. 1.

During the course of the chapter 11 case, the Debtor marketed the Property for sale, ultimately obtaining a purchase price of $2,500,000.00. Main Case, Debtor in Possession's Mot. Sell Real Property at 3, ECF No. 44. In the Debtor's motion seeking approval of the sale of the Property, the Debtor listed the following approximate balances on the secured obligations: PS Funding - $2,903,3569.00, and Three Sisters - $313,889.36. *Id.* at 2. The Court does not need to reach question of whether either set of numbers was accurate; it is sufficient to note that in either case the proposed purchase price was less than the combined outstanding balances due to PS Funding and Three Sisters. Both PS Funding and Three Sisters consented to sale of the Property free and clear of their liens, with such liens "attaching to the proceeds of the sale in the same order

6

and priority and the same validity and extent as such liens are determined . . . to have existed on the Property immediately prior to the sale" as determined in this adversary proceeding. Main Case, Order Approving Debtor in Possession's Mot. Sell Real Property at 3, ECF No. 53. After approval, the sale resulted in $2,077,253.07 of Net Sale Proceeds, which were initially placed in Debtor counsel's IOLTA trust account pending resolution of this adversary proceeding. Main Case, Debtor's Report of Sale at 2, ECF No. 70. Later, the Net Sale Proceeds were placed into the Court's registry on the same terms and conditions. Main Case, Am. to Corrected Order Approving Debtor in Possession's Mot. to Sell Real Property, ECF No. 82.

    *c.*    *Claim to Determine Liens Priority*

Prior to the closure of the sale, PS Funding commenced this adversary proceeding to determine the validity, priority, and extent of liens in the Property, naming Three Sisters, Lawrence Tucker, Esq., Trustee, and the Debtor as defendants. AP, Complaint, ECF No. 1. Mr. Tucker was named as a defendant in his capacity as trustee of the Three Sisters DOT. AP, Complaint at 5, ECF No. 1. On June 8, 2021, Mr. Tucker, *pro se*, filed a response, "disclaim[ing] any and all right, title, interest, lien or claim in or to" the Property, including "pursuant to the Deed of Trust dated July 23, 2018" and requesting to be dismissed from the case. AP, Response to Adversary Complaint and Notice of Disclaimer of Interest, ECF No. 12. Despite Mr. Tucker's status as a member of the bar of Maryland,[6] his response was procedurally improper. However, given his written disclaimer and upon review of the evidence at Trial, the Court finds that Mr. Tucker, Trustee has no lien, claim, or other interest in the Property or the proceeds thereof. Therefore, the remaining issues are the extent and priority of the liens of PS Funding and Three Sisters in the Property and the Net

---

[6] The Court notes that Mr. Tucker's business address is in Virginia, but it does not appear that he is a member of the bar of Virginia, though that distinction is not noted anywhere on his website. It does appear that his letterhead notes his sole admission in Maryland.

7

Sale Proceeds.

The Complaint contains three counts: Count I—Equitable Subrogation, Count II—Quiet Title, and Count III—Declaratory Judgment whereby PS Funding seeks a determination that immediately prior to the sale a portion of the PS Funding Loan is entitled to a partial superior priority position against the Property superior to the Three Sisters Loan.[7] As pled, Counts II and III seek specific relief as to the land records if PS Funding is successful in all, or in part, on Count I. Count I seeks a determination that the PS Funding Loan be equitably subrogated to the positions previously held by the JM1 DOT (first priority) and the Tucker DOT (second priority), for a total principal amount of $1,996,000 (the amounts paid to JM1 and Tucker at closing) plus 8.5 percent interest on the principal of $1,568,000 from the date of the Replacement Transaction to the sale of the Property, and no interest on the remaining principal of $428,000, with the balance remaining in a junior position to Three Sisters. Excluded from the equitable subordination request is any other balance of the PS Funding Loan including attorneys' fees, costs, and the cash out amount paid to the Debtor at the time of the Replacement Transaction or any interest or charges related thereto.

### III. Discussion

*a. Count I–Equitable Subrogation*

The principal cause of action in the Complaint is PS Funding's request that the PS Funding Loan be equitably subrogated to the JM1 DOT and the Tucker DOT on the Property, resulting in PS Funding holding a higher priority lien in the Property for the amounts paid to pay off those loans, plus certain interest. As assignee of the BCJCL DOT, PS Funding gains all legal and equitable rights BCJCL had to enforce the deed of trust including any related causes of action. *See* D.C. Code § 28:3-203(b); AP, Ex. 11, ECF No. 73-11. Because PS Funding acquired all legal and

---

[7] The Complaint was filed prior to the closing of the sale, as a result of the sale the relief transferred to the Net Sales Proceeds as set forth in the order approving the sale.

8

equitable claims of BCJCL and is the Plaintiff herein, the Court will refer to PS Funding in its analysis.

Equitable subrogation is an equitable doctrine which modifies the general principle that priority of liens is determined by "first in time, first in right." *E. Sav. Bank, FSB v. Pappas*, 829 A.2d 953, 956-67 (D.C. 2003). *See also Le Brun v. Prosise*, 79 A.2d 543, 548 (Md. Ct. Spec. App. 1951) (citing *Carpenter v. Longan*, 83 U.S. 271, 274 (1872), for the rule that "[a]n assignment of the note carries the mortgage with it"). Subrogation is the substitution of one party to the position of another whose claim the former has satisfied. *Pappas*, 829 A.2d at 957. "'The doctrine of subrogation is not dependent upon contract, nor upon privity between the parties . . . it is the creature of equity and is . . . applied in favor of all persons who are required to pay the debt of another for the protection of their own interests.'" *Burgoon v. Lavezzo*, 92 F. 2d 726, 729 (D.C. Cir. 1937) (internal citations omitted).[8]

The doctrine of equitable subrogation has been recognized by courts in the District of Columbia for over a century in circumstances to provide relief to a party that pays the mortgage of another and takes a new mortgage to provide subrogation to the rights of the first mortgage against any intervening lienholder. *Pappas*, 829 A.2d at 957. In order to show entitlement to relief under the doctrine, a plaintiff must show five factors: (i) payment was made by the subrogee to protect his own interest; (ii) the subrogee has not acted as a volunteer; (iii) the debt paid was one for which the subrogee was not primarily liable; (iv) the entire debt has been paid; and (v)

---

[8] *See also Cont'l Cas. Co. v. N. Am. Capacity Ins. Co.*, 633 F.3d 79, 88 (5th Cir. 2012) ("equitable subrogation . . . employs 'a legal fiction whereby an obligation, extinguished by a payment made by a third person, is treated as still subsisting for the benefit of this third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another.'"); *NSEW Holdings LLC v. Wells Fargo Bank, N.A.*, No. 4:15-CV-828, 2017 WL 1030313, at *3 (E.D. Tex. Mar. 17, 2017) (citing *Bank of Am. v. Babu*, 340 S.W. 3d 917, 925 (Tex. App. 2011) ("Equitable subrogation 'is a legal fiction' whereby an obligation, extinguished by a payment made by a third person, is treated as still subsisting for the benefit of this third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another.").

subrogation would not work any injustice to the rights of others. *Id.* at 961 (citing *Caito v. United California Bank*, 576 P.2d 466, 471 (Cal. 1978)).

In this case, it is clear and undisputed that the first four factors are met with respect to PS Funding, and the JM1 and the Tucker Loans. Through the Replacement Transaction, PS Funding paid off the JM1 Loan and the Tucker Loan to protect its interest as lender under the Replacement Transaction. PS Funding was not acting as a "volunteer" when it entered into the Replacement Transaction with the Debtor. The loan was an arms-length business transaction. PS Funding was not liable on either the JM1 Loan or the Tucker Loan. The entire balances of the JM1 Loan and Tucker Loan were paid out of the funds from the Replacement Transaction. Thus, the question becomes whether subrogation of the PS Funding Loan to the JM1 DOT and Tucker DOT would work an injustice on the rights of Three Sisters. Subrogating Three Sisters to a junior position does not necessarily, in and of itself, work an injustice to Three Sisters because immediately prior to the Replacement Transaction, Three Sisters was in third position after the JM1 and Tucker Loans. While Three Sisters may not have been aware that it was junior to two senior liens, at all times prior to the Replacement Transaction, Three Sisters understood itself to be in a junior lien position.

In considering whether the requested subrogation would work an injustice to Three Sisters, the Court must examine the differences between the original deeds of trust (JM1 and Tucker) and the deed of trust of the party requesting subrogation (PS Funding). A change in the terms of a mortgage is not *per se* materially prejudicial to a junior lienor, instead, a court must examine the facts and circumstances of the requested subrogation, including the interest rate, principal amount, and any extension of time. *See* Restatement (Third) of Property (Mortgages) § 7.6 cmt. e (1997) ([hereinafter Restatement)] (citing to Restatement (Third) of Property (Mortgages) § 7.3 cmts. b, c (1997)).

The Court's analysis is limited by and to the evidence admitted at Trial. Specifically, each of the relevant deeds of trust were admitted to evidence, but neither the JM1 Note nor the Tucker Note were admitted to evidence. As discussed *supra*, testamentary evidence was entered to establish the interest rates on the JM1 Note which the Court finds credible. There is no evidence regarding any terms of the Tucker Note other than the payoff amount from the Replacement Transaction. The evidence (or lack thereof) as to the interest rate is relevant because PS Funding seeks to be subrogated to the rights and priority of both the JM1 DOT and Tucker DOT as of the date of the Replacement Transaction. However, recognizing there is no evidence as to the interest charged under the Tucker Note, PS Funding limits its request to only the payoff amount of the Tucker Note of $428,000. The relevant deeds of trust reflect that the Replacement Transaction modified the principal balance, the interest rate on the JM1 Note, and the loan term from the JM1 Loan and Tucker Loan. The Court will address the potentially prejudicial nature of each of these modifications in turn.

      i.    Principal Balance

Any increase in the amount of the loan from the original amount would be prejudicial. Restatement, § 7.3 cmt. b (an "increase in the principal amount will prejudice the holder of junior interests"). However, if the junior lienholder is subrogated only to the extent of the payoff of the senior lienor's mortgage at the time of the transaction, then there is no resulting prejudice. *See E. Sav. Bank, FSB v. Pappas*, 829 A.2d 953, 960 (D.C. 2003). The PS Funding Loan reduced the face principal amount of debt senior to Three Sister from $2,200,000 ($1,800,000 JM1 + $400,000 Tucker) to $2,122,500 (PS Funding).[9] However, the Complaint only seeks equitable subrogation

---

[9] This total includes $64,987.18 cash paid to the Debtor at the Replacement Transaction, which could be reasonably reduced from the allowable amount of subrogation due to clear prejudice to Three Sisters by the payment to the Debtor instead of to Three Sisters towards their secured obligation.

11

for the principal amount of $1,996,000 disbursed from the PS Funding Loan to pay off the JM1 and Tucker Loans, with the balance of the PS Funding Loan to remain in a junior position to Three Sisters. In either case, the principal amount of the obligations to PS Funding are less than the original total debt of the obligations paid off by the PS Funding Loan. Thus, there is no prejudice to Three Sisters as a result in the change of the principal amount of the Replacement Transaction.

      ii.    Interest on Amounts Subrogated

An increased interest rate can be materially prejudicial "if the payor demands a higher interest rate than prevailed under the original mortgage loan, the positions of intervening interest holders may be jeopardized, since the increased interest may result in the mortgage's having a higher balance at the time it is later foreclosed." Restatement, § 7.6 cmt. e. The non-default rate of interest on the JM1 Loan was 12 percent. The interest rate on the PS Funding Loan is 8.5 percent. Due to a lack of evidence on the interest rate as to the Tucker Loan, the Plaintiff does not request subrogation for any interest accrued on the $428,000 used to pay off the Tucker Note. Any interest accrued on that amount or the balance of the note except the $1,568,000 paid towards the JM1 Loan shall retain a junior priority position. As a result, the requested equitable subrogation is not a prejudice to Three Sisters because the interest rate is reduced by 3.5 percent as to the JM1 Loan and the full amount of interest on the Tucker Loan.

      iii.    Loan Terms

A mere extension of time is "generally not regarded as seriously prejudicial to holders of intervening interests and is often advantageous to them." Restatement, § 7.6 cmt. e. The Replacement Transaction extended the maturity date of the JM1 and Tucker Loans from November 11, 2016 and May 10, 2018, respectively, initially to March 1, 2020. On its own, such extension of maturity dates is not prejudicial. Furthermore, the Replacement Transaction did not place Three

Sisters in a substantially weaker position. At the time of the Three Sisters Loan, Three Sisters was in third position, but with the request by Plaintiff in this case, Three Sisters would hold a similar priority position with a lower total higher priority debt.

        iv.    Windfall

The purpose of equitable subordination is to ensure that the junior lienholder does not receive a windfall. *Smith v. First Am. Title Ins. Co. (In re Stevenson)*, 789 F.3d 197, 201 (D.C. 2015). PS Funding limits its subrogation request to the amounts used to pay off JM1 and Tucker. If PS Funding is not substituted to the rights, remedies, and securities of the JM1 and Tucker Loans as discussed herein, the result would be a windfall in an increased priority for Three Sisters without any additional consideration. This conclusion is supported by the comments to the Restatement, which instruct that the Court should not infer any intent by PS Funding to subordinate the PS Funding Loan to Three Sisters in the absence of a clear statement or other proof to the effect. *See* Restatement, § 7.3 cmt. b. The instruction to not infer intent applies even in situation such as this, where the senior mortgagee had actual knowledge of a junior lien at the time of the subsequent transaction. Restatement, § 7.3 cmt. b. In this case, the evidence clearly supports the contrary finding—that PS Funding intended to be in first position after the Replacement Transaction.

Upon a review of each of the relevant elements, and after consideration of the evidence, the Court finds that PS Funding has shown by a preponderance of the evidence that is entitled to have the PS Funding lien equitably subrogated to the priority positions previously held by the JM1 Lien and the Tucker Lien on the Property in the amount of $1,996,000 plus 8.5 percent interest on $1,568,000 from the date of the Replacement Transaction through May 18, 2022.

        *b.*    *Counts II and III are Moot*

Counts II and III of the Complaint—Quiet Title and Declaratory Judgment—are each

13

dependent upon the Court's determination as to Count I and request relief in the land records of the District of Columbia. Specifically, to the extent PS Funding is successful on Count I, PS Funding asks the Court to issue certain orders to the Clerk of Court of the Superior Court to reconcile the land records to reflect the results of any judgment issued by this Court. Such relief would only be necessary if the Debtor remained the owner of the Property. However, as the Property was sold during the pendency of this adversary proceeding and the only remaining asset is the Net Sale Proceeds, the requested relief as to the land records is moot.

### IV.     Conclusion

For the reasons stated herein, the Court finds that PS Funding is entitled to be equitably subrogated to the priority positions previously held by the JM1 DOT and Tucker DOT. The balance of the relief requested in the Complaint is denied as moot. Therefore, the order of priorities on the Net Sale Proceeds is as follows:

1) PS Funding shall have a first position lien in the amount of $1,568,000 plus 8.5 percent interest from February 28, 2019 through May 18, 2022.

2) PS Funding shall have a second position lien in the amount of $428,000.

3) Three Sisters shall have a third priority lien for the balance of their claim.

4) PS Funding shall have a fourth priority lien for the balance of their claim after the amounts in 1 and 2 above.

5) Defendant Laurence Tucker, Trustee has no lien, claim, or other interest in the Property or the proceeds thereof.

Separate Order to follow.

[Signed and dated above.]

Copies to: recipients of electronic notifications.